UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAMARK MARINE TOWING, LLC,

    Plaintiff,

v.

RALPH MOLINARO et al.,

    Defendants.

Case No. 23-12293
Honorable Laurie J. Michelson

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [45]**

In the late evening of September 2, 2022, Ralph Molinaro was sailing his vessel, the "High Tide Waters," in the Detroit River when he struck a cement dock. The vessel began taking on water, and one of the passengers called the U.S. Coast Guard for help. The Coast Guard in turn contacted Damark Marine Towing, LLC, a professional marine salvage and towing company, that was able to deploy equipment and manpower to keep the vessel afloat throughout the night, remove it from the dock, and tow it to a nearby hoist, where it was lifted from the water. After this successful salvage, Molinaro repaired the vessel and continues to sail it to this day. Molinaro wanted Damark to be paid for rescuing his vessel, but his insurer, GEICO Marine Insurance Company, refused to pay Damark's requested salvage award. So this litigation ensued.

After lengthy and contentious discovery, Damark filed a motion for summary judgment arguing it is entitled to a salvage award of not less than $33,250 as a matter

of law. (ECF No. 45.) Defendants oppose the motion, mainly on the issue of damages and not liability. (ECF No. 49.) They seek to limit any salvage award to no greater than $5,000. The motion is fully briefed and does not require further argument. *See* E.D. Mich. L. R. 7.1(f). For the reasons that follow, the motion will be GRANTED as to liability and DENIED as to damages.

## I. Background

Late in the evening on September 2, 2022, Molinaro was sailing the "High Tide Waters" in the Detroit River with five passengers aboard. (ECF No. 45-4, PageID.1260–1261.) Around 10:30 p.m., Molinaro struck and impaled his vessel on a cement dock near the Humbug Marina, creating a large hole in the port side hull which began to let water into the lower portion of the boat. (*Id.* at PageID.1262, 1267.)




(ECF No. 45-5, PageID.1293, 1297.) One of the passengers called the U.S. Coast Guard for help (ECF No. 45-4, PageID.1262–1263), and the Coast Guard in turn

contacted Damark Marine Towing, LLC (ECF No. 45-3, PageID.1076), a professional marine salvage and towing company that services the Detroit River (ECF No. 45, PageID.948). The Coast Guard was 30–45 minutes away, while Damark was close by. (ECF No. 45-3, PageID.1077.) In fact, Damark's base of operations was right next to the Humbug Marina:



Captain Jeffrey Pidcock, the president of Damark and a working salvor (ECF No. 45-2, PageID.1056), immediately headed to the site of the incident on one of

Damark's salvage vessels (ECF No. 45-3, PageID.1085; ECF No. 45-4, PageID.1265–1266). He found Molinaro's boat actively taking on water. (ECF No. 45-3, PageID.1085.) Most, if not all, of the passengers had already evacuated, but Molinaro was still on his boat. (ECF No. 45-4, PageID.1263.) He called out to Pidcock for help. (ECF No. 45-3, PageID.1086 ("[T]he boat owner, Ralph Molinaro, [was] screaming [']Jeff, help me, my boat is sinking. Don't let it sink, Jeff. Don't let it sink.[']").)

Although the vessel most likely would not have sunk completely, as the incident occurred in shallow water and the front of the boat was firmly impaled on the dock (ECF No. 45-2, PageID.1042; ECF No. 45-4, PageID.1270), the vessel's stern and aft—which contained the engines, generators, and fuel tanks—were in danger of sinking below water level, (ECF No. 45-2, PageID.1042; ECF No. 45-3, PageID.1086–1087, 1098, 1201). If these parts sank, hundreds of gallons of diesel fuel and oil could have spilled into the river. (ECF No. 45-3, PageID.1081–1082; ECF No. 50, PageID.1893.) This would have been particularly damaging since the Humbug Marina, where the vessel was impaled, is very near the Humbug Marsh Unit National Wildlife Refuge. (ECF No. 45, PageID.950.)

Pidcock worked diligently to prevent this from happening. He helped Molinaro off the boat (ECF No. 45-4, PageID.1263) and then placed two high-capacity dewatering pumps in the impaled vessel (ECF No. 45-3, PageID.1096–1097). Four more were employed about an hour later, when additional salvage vessels arrived. (*Id.* at PageID.1097, 1100.) The salvage crew also installed a temporary patch on the puncture and air pillows to block the holes. (*Id.* at PageID.1096; ECF No. 45-4,

4

PageID.1266.) A hoist was not available until the next day, since it was the middle of the night on Labor Day weekend. (ECF No. 45-3, PageID.1119.) So the crew had to continually cool and re-fuel the pumps throughout the night. (*Id.* at PageID.1099.)

In the morning, divers rigged air bags underneath Molinaro's boat and attached tow lines connecting it to one of Damark's salvage vessels. (ECF No. 45-3, PageID.1119–1121, 1127–1128.) The salvage vessel carefully pulled the boat off the dock and a second of Damark's salvage vessels was then attached to it for towing. (*Id.* at PageID.1128–1130.) Damark's two vessels[1] towed the boat a few hundred yards to the Humbug Marina hoist, where it was finally lifted out of the water. (*Id.* at PageID.1131–1132; ECF No. 49, PageID.1624.) In total, the salvage took about 18 hours. (ECF No. 45-3, PageID.1084.)

Soon after, Molinaro filed a claim with his insurance provider, GEICO Marine. (*See* ECF No. 49-6, PageID.1880.) Norm Bodi, a GEICO Marine appraiser, was assigned to evaluate the value of the vessel. (ECF No. 49, PageID.1620.) Molinaro purchased the High Tide Waters—a 38-foot Performance Cruiser—in 2016 for $95,000. (ECF No. 45, PageID.949.) He invested over $23,000 in upgrades, improvements, and modifications. (*Id.*) But Bodi estimated that, factoring in the six years of depreciation since the purchase, the vessel had a pre-casualty value of $76,304 and would cost $94,676 to repair. (ECF No. 49-4, PageID.1876; ECF No. 49-5, PageID.1878.) So GEICO deemed the vessel a "constructive total loss"—meaning

---

[1] Damark says a third vessel also followed behind, as a precaution. (ECF No. 45-3, PageID.1130.) But Defendants dispute that more than two vessels were used. (ECF No. 49, PageID.1624–1625.)

the repair cost exceeded the value of the vessel—and offered Molinaro a payment of $99,446.41. (ECF No. 49-6, PageID.1880).) Upon this payment, GEICO would become the owner of the vessel. (ECF No. 49, PageID.1620.)

But Molinaro wanted to keep his boat. In his mind, it was "one of a kind." (ECF No. 45, PageID.949, ECF No. 45-2, PageID.1007.) And he believed he could repair the damage. (ECF No. 45-3, PageID.1151 ("Mr. Molinaro from the night of the incident . . . never wavered. He was always going to fix that boat.").) Under the insurance policy, once his boat was deemed a constructive total loss, Molinaro had a right of first refusal to repurchase the boat from GEICO. (ECF No. 45-13, PageID.1433.) He indicated to GEICO that he wanted to exercise this right. (ECF No. 45-2, PageID.1006.) So GEICO offered to let him keep the boat in exchange for reducing his insurance payment by $5,000 (the post-casualty value of the vessel as estimated by a third-party salvage company that GEICO consulted). (ECF No. 45-13, PageID.1431–1435; *see* ECF No. 45-2, PageID.1006.) Molinaro immediately accepted. (ECF No. 45-2, PageID.1006.) He got to keep his boat, along with $94,446.41 that GEICO paid him under the insurance policy. (ECF No. 49-6, PageID.1880.) He then repaired the boat himself, spending around 500 hours and $17,000. (*Id.* at PageID.1025–1026; ECF No. 49-7, PageID.1891.)

In the meantime, Damark issued an invoice to Molinaro for payment of a $33,250 salvage award. (ECF No. 45-6; *see* ECF No. 45, PageID.953.) Molinaro tendered this invoice to GEICO and urged it to pay Damark. (ECF No. 45, PageID.953.) GEICO responded by asking Damark for a time-and-materials invoice

that broke down what equipment was used, how long it was used for, and what the cost of those services would ordinarily be. (ECF No. 45-13, PageID.1510–1511.) Damark sent GEICO a time-and-materials invoice that detailed about $100,000 in costs. (*Id.* at PageID.1512.) But this discrepancy between what Damark was asking for as an award ($33,250) and what it had apparently spent ($100,000) gave GEICO pause. (*Id.* at PageID.1513.) So it hired outside counsel to advise and assist with negotiations. (*Id.* at PageID.1513, 1516.) Negotiations were ultimately unsuccessful, and Damark filed this suit seeking payment of its requested salvage award.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Or, stated less formally, Damark is entitled to summary judgment only if no reasonable jury could find in favor of Defendants. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In making this determination, the Court must view the facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party—in this case, the defendants. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But the Court does not weigh evidence, assess credibility of witnesses, or determine the truth of matters in dispute on summary judgment. *Anderson*, 477 U.S. at 249.

## III. Analysis

There are two main issues before the Court: (1) whether Damark is entitled to a salvage award and (2) if so, how much.

### A. Damark's Entitlement to a Salvage Award

A salvage is a "service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended." *McConnochie v. Kerr*, 9 F. 50, 53 (S.D.N.Y.), *modified sub nom. McConnochin v. Kerr*, 15 F. 545 (C.C.S.D.N.Y. 1883). There are two main types of salvage: (1) pure salvage, where voluntary assistance is rendered without a prior agreement "wherein the compensation is dependent upon success," and (2) contract salvage, where assistance is rendered pursuant to the terms of a contract and compensation may or may not be tied to success. *The Elfrida*, 172 U.S. 186, 192 (1898); *see also Tug Blarney, LLC v. Ridge Contracting, Inc.*, 14 F. Supp. 3d 1255, 1266 (D. Alaska 2014).

Here, Damark brings a claim for pure salvage. To prove this claim, Damark must establish three elements: (1) that the vessel was in "marine peril," (2) that "[s]ervice [was] voluntarily rendered when not required as an existing duty or from a special contract," and (3) that the salvage was a "[s]uccess in whole or in part, or that the service rendered contributed to such success." *The Sabine*, 101 U.S. 384, 384 (1879); *see also Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 622 (6th Cir. 2013).

Damark has argued and presented evidence that its services meet all three of these elements. Defendants have made almost no attempt to rebut Damark's

8

showing, instead focusing their response brief on the damages amount. The Sixth Circuit has held that "when a party fails to respond to a motion or argument therein, the lack of response is grounds for the district court to assume opposition to the motion is waived, and grant the motion." *Hill v. Jones*, No. 18-511, 2019 WL 4455982, at *3 (E.D. Ky. Sept. 17, 2019) (collecting cases); *see Irvin v. State Farm Mut. Auto. Ins. Co.*, No. 19-690, 2020 WL 4004808, at *4 (W.D. Ky. July 15, 2020), *aff'd*, 861 F. App'x 65 (6th Cir. 2021). Also, "issues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)). So it seems that Defendants have waived, or at least forfeited, any arguments as to their liability to Damark for a pure salvage claim.

But this does not end the inquiry. "Even when faced with an unopposed motion for summary judgment," or in this case, an unopposed argument in a summary judgment motion, "the district court cannot grant a motion for summary judgment without first considering supporting evidence and determining whether the movant has met its burden." *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 675 (6th Cir. 2013); *see also Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 381 (6th Cir. 2011) ("[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded. The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden." (quoting *Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir.

9

1991))). This is especially true where, as here, the movant seeks summary judgment on claims for which it would bear the burden of persuasion at trial. *Citizens Ins. Co. of the Midwest v. Perry*, No. 22-12302, 2024 U.S. Dist. LEXIS 55218, at *6 (E.D. Mich. Mar. 27, 2024). Its showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for [it]." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting William W. Schwarzer, *Summary Judgment Under the Federal Rules*, 99 F.R.D. 465, 487–88 (1984)). Therefore, the Court "must review carefully the evidence that was designated by the moving party" to ensure it has discharged its burden. *Jones v. Kimberly-Clark Corp.*, 238 F.3d 421, 2000 WL 1800475, at *3 (6th Cir. 2000) (per curiam) (unpublished table decision).

So the Court will undertake a brief review of the evidence to ensure that Damark has satisfied its summary judgment burden and established its entitlement to a salvage award.

### 1. Marine Peril

First, the vessel was indisputably in marine peril.

A marine peril exists "when a vessel is exposed to any actual or apprehended danger which might result in her destruction." *Faneuil Advisors, Inc. v. O/S Sea Hawk,* 50 F.3d 88, 92 (1st Cir. 1995). However, the danger need not be "immediate" or "absolute." *Id.*; *see also Southernmost Marine Servs., Inc. v. M/V Potential* ("*Southernmost I*"), 250 F. Supp. 2d 1367, 1377 (S.D. Fla. 2003) ("[A] marine peril exists where a vessel is in danger of being partially or totally lost and where it is not being successfully salved when the plaintiff voluntarily undertakes its salvage

operation."), *aff'd*, 91 F. App'x 655 (11th Cir. 2004). "All that is necessary is 'reasonable apprehension of injury or destruction if the [salvage] services are not rendered.'" *Offshore Marine Towing, Inc. v. Gismondi*, 504 F. Supp. 3d 1349, 1354 (S.D. Fla. 2020) (alteration in original) (quoting *Phelan v. Minges*, 170 F. Supp. 826, 828 (D. Mass. 1959)). "[T]his determination must be made in light of the circumstances as they appeared at the time of the event and not from hindsight." *In re M/V Andrew J. Barberi*, 534 F. Supp. 2d 370, 377 (E.D.N.Y. 2008); *see also Miss. Barge Line Co. v. Indian Towing Co.*, 232 F.2d 750, 755 n.8 (5th Cir. 1956) ("[T]he likely peril is to be viewed through [the salvor's] eyes at the time he is determining whether to respond to the gallant call of the sea.").

Here, the undisputed record supports that Molinaro's vessel was in marine peril when Damark began its salvage operation. As Pidcock describes, he first became aware of the situation when "[t]he United States Coast Guard [] called [Damark] after receiving a call from a vessel that had struck an object with numerous passengers and people on-board." (ECF No. 45-3, PageID.1076.) The Coast Guard advised "it was taking on water and sinking" and requested Damark's help to respond because "the Coast Guard would be at least 30 to 45 minutes away." (*Id.* at PageID.1077.) Thus, at the time Damark learned of the situation and was determining whether to respond, it had been advised that there was a sinking vessel with people on-board that needed assistance within the next 30–45 minutes, at least.

When Pidcock arrived, he saw that Molinaro had struck a cement dock and his vessel was impaled with a large hole in its side. (ECF No. 45, PageID.949–950; ECF

11

No. 45-4, PageID.1262, 1267.) It was actively taking on water.[2] (ECF No. 45, PageID.950; ECF No. 45-3, PageID.1085; ECF No. 45-4, PageID.1262.) Its engines and other components were in danger of being further submerged. (ECF No. 45-2, PageID.1042; ECF No. 45-3, PageID.1086–1087.) And Molinaro and Pidcock both believed the vessel was in danger of sinking further (even if they recognized it would not sink *completely*). (ECF No. 45-2, PageID.1042; ECF No. 45-3, PageID.1085–1086.)

This is enough to find that the vessel was in peril. *See New Bedford Marine Rescue, Inc. v. Cape Jeweler's Inc.*, 240 F. Supp. 2d 101, 112–13 (D. Mass. 2003) (finding marine peril where a docked boat was taking on water, even though the water at the dock was only four to seven feet deep, because the boat was "not settling on the channel bottom" and was in danger of "sink[ing] further"); *Southernmost I*, 250 F. Supp. 2d at 1377 (finding that a vessel impaled on a rock formation and taking on water was in marine peril in part because it was "in peril of sinking and breaking apart if it had been simply pulled off its impaled position . . . without the prior affixing of substantial flotation gear"). Indeed, a reasonable factfinder could not find otherwise.

---

[2] Although this fact is not entirely undisputed (*compare* ECF No. 45-13, PageID.1368 *with* ECF No. 49, PageID.1623), the Court is not convinced there is a *genuine* dispute. Molinaro and Pidcock say the vessel was actively taking on water. Jason Grayauskie (a GEICO liability adjuster who was not on scene at the time of the incident) said he could not tell whether the vessel was actively sinking or simply filled with water because he merely reviewed still photos of the incident. (ECF No. 45-13, PageID.1368–1370; ECF No. 49-3, PageID.1685–1687.) This is the only admissible evidence Defendants provide to rebut the assertion that the vessel was actively taking on water. Since Grayauskie could not say whether the vessel was taking on water or not, this is not inconsistent with Molinaro and Pidcock (eyewitnesses to the salvage) saying that it was.

12

Thus, the Court concludes that the vessel was in marine peril when Damark responded to the scene.

### 2. Voluntarily Rendered

Next, there can be little dispute that Damark's services were voluntarily rendered.

A voluntary salvage is one undertaken in the "absence of a legal duty or obligation" to perform salvage services. *Joseph v. J.P. Yachts, LLC*, 436 F. Supp. 2d 254, 268 (D. Mass. 2006). In ascertaining whether services rendered by a salvor are voluntary, "the rule is that nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage." *The Camanche*, 75 U.S. (8 Wall.) 448, 477 (1869). A contract for services other than salvage, such as a towing contract, will not prevent the recovery of a pure salvage award. *Joseph*, 436 F. Supp. 2d at 270; 8 Benedict on Admiralty § 13.06 (2025).

Again, Damark responded to a call from the Coast Guard asking it to assist a nearby vessel that was impaled and taking on water. Although Damark was a professional salvage company and may have been motivated by the possibility of a monetary award, that does not preclude its services from being voluntary. *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 339 (2d Cir. 1983); 3A Benedict on Admiralty § 81 (2025).

13

More importantly, Damark had no contractual duty to salvage the vessel but nonetheless provided assistance. There is no evidence that Pidcock and Molinaro made a verbal contract before or during the salvage. And Molinaro, in an email to GEICO, specifically said he did not sign any written salvage agreements. (ECF No. 45-7, PageID.1305.) True, Damark did have a licensed service agreement with TowBoat U.S. to provide towing services to members at fixed rates. (ECF No. 45-3, PageID.1057–1059, ECF No. 45-13, PageID.1363); *see also Low Cost Towing*, Tow Boat U.S. Detroit, https://perma.cc/79T3-PB42. And Molinaro was a TowBoat U.S. member. (ECF No. 45-3, PageID.1191–1192.) But this contract specifically did not cover salvage services. (*Id.*) So it does not prevent the recovery of a pure salvage award.

Accordingly, the Court concludes Damark's salvage services were voluntarily rendered, and that no reasonable factfinder could conclude otherwise.

### 3. Success

Lastly, the salvage was undoubtedly successful.

A salvage award is proper where there was "[s]uccess in whole or in part" or when "the service rendered contributed to such success." *The Sabine*, 101 U.S. at 384. "Success" in salvage law is "preservation of the property for the benefit of the owner." 3A Benedict on Admiralty § 90 (2025); *see also Tug Blarney*, 14 F. Supp. 3d at 1271. A salvage is considered successful even if it preserves only some of the vessel's pre-salvage value. *See In re Mielke*, No. 10-13519, 2013 U.S. Dist. LEXIS 156693, at *4, 15–16 (E.D. Mich. Nov. 1, 2013) (finding success where a salvage company rescued a

14

vessel that had "an eight-foot hole" in its side after colliding with a second vessel and noting the fact that the salvaged vessel "remained submerged for many hours and still retained a salvage value of $3,000" indicated that the salvage company was "at least, partially successful in its salving efforts").

Here, Damark was clearly successful in its salvage operations. Even if the Court were to accept Defendants' contention that the post-salvage value of the vessel was $5,000, that is some value that Damark preserved for Molinaro. And that is enough to find the salvage successful. While the degree of success can factor into the size of the award, all that is needed to prove entitlement to the award is partial success.

There is also evidence that Damark preserved more than simply $5,000 in value for Molinaro. As Pidcock explains, "[t]he damage to the boat was fiberglass. All the machinery, all the electronics, all of the cabinets, all the carpets, all the steering system, the transmission systems, propulsion systems were all safe . . . the [new] electronics that . . . [Molinaro] had just installed . . . never did get wet, and that's because of our efforts." (ECF No. 45-3, PageID.1143–1144, 1147.) And what is more, Molinaro was able to repair his boat for about $80,000 less than the GEICO estimate and continues to sail it to this day.

Thus, the Court concludes that Damark was successful in its salvage and that no reasonable factfinder could conclude otherwise.

Since all three elements of a pure salvage claim have been met, the Court grants Damark's motion for summary judgment as to liability.

15

## B. Value of the Salvage Award

The amount of damages that Damark is entitled to is another story.

There are six factors that courts consider when determining the value of a salvage award: (1) the labor expended by the salvors in rendering the salvage service; (2) the promptitude, skill, and energy displayed in rendering the service and saving the property; (3) the value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed; (4) the risk incurred by the salvors in securing the property from the impending peril; (5) the value of the property saved; and (6) the degree of danger from which the property was rescued. *Blackwall*, 77 U.S. (10 Wall.) 1, 14 (1869).

The parties dispute each of these factors and the relevant facts. It is true that Defendants withdrew their expert report and reliance on his opinions. But they still have records of repair and appraisals, photographs from the salvage, testimony of the GEICO appraiser, testimony of Molinaro, and challenges to Plaintiff's evidence. This creates genuine issues of material fact. For example, Damark says this was a risky operation due to the darkness and "the current on the Detroit River" and that it displayed a great deal of skill in its response to the situation (ECF No. 45, PageID.964–965); Defendants say this "was a routine and straightforward salvage operation, requiring minimal expertise . . . [and] no significant risks" (ECF No. 49, PageID.1633). Damark says it employed expensive equipment and significant resources in the salvage, including six pumps, three vessels, and five air bags—one of which was destroyed (ECF No. 45, PageID.966–967); Defendants dispute the

16

number of vessels and pumps involved, and the amount of time that each was employed (ECF No. 49, PageID.1624–1625, 1634–1635). And most significantly, Damark values the post-salvage vessel at $85,000 (ECF No. 45, PageID.964) while Defendants value it at $5,000 (ECF No. 49, PageID.1630).

Because there are genuine disputes of facts material to the proper value of the salvage award, the Court cannot grant summary judgment as to damages.

### IV. Conclusion

For the foregoing reasons, Damark's motion for summary judgment (ECF No. 45) is GRANTED as to liability and DENIED as to damages. The Court concludes that Damark is entitled to a salvage award, but will determine the appropriate value of that award at trial. Trial is hereby scheduled for May 22 and 23, 2025.

SO ORDERED.

Dated: April 16, 2025

                                        s/Laurie J. Michelson
                                        LAURIE J. MICHELSON
                                        UNITED STATES DISTRICT JUDGE